Good morning, Your Honor. How are you, Mr. Reardon? Mr. Reardon, the appearance of Petitioner Woods. We know you. We know you. Thank you, Your Honor. I meant that in a good way. I was trying to recall the first time I appeared before Judge Kaczynski, and it was longer than I care to remember. And I think both of us had less white hair. Considerably less. Considerably less, Your Honor. In the brief time we'll be together this morning, I just wanted to emphasize three points about this case. For those of us who labor in the vineyards of federal habeas corpus, we are well aware that the sine qua non, the threshold requirement, would be that something went very wrong in a state proceeding. And of course it's got to be framed in federal constitutional terms, but you're talking about a basic, basic fundamental unfairness in the state proceeding. And I think the state court opinion establishes that. The state court found that the prosecutor in this case used significant coercive force in order to prevent a witness that the defense viewed as key to their defense from testifying. That isn't the way things should be done. Well, let's agree that it maybe shouldn't be done, but how do you distinguish the case of Mitchell v. United States? When this happens before the sentencing takes place, Mitchell says this is all right. Well, Your Honor, I would submit that the facts of this case, which demonstrate that there was absolutely, this is a witness who has, the trial court finds, effectively entered into a plea bargain, that he will testify and testify truthfully. He's entered that agreement with the prosecution. He's bound by the terms of it to testify truthfully. The prosecutor says that it just doesn't make any difference how long you continue this trial. I will make sure that the deal is never consummated so that he never testifies. I understand the facts and is very coercive, but Mitchell seemed to say it's okay until he's been sentenced, and he was not sentenced, and the government indicated it would continue the trial. His trial would not sentence him until after this trial was over. The factual record here, Your Honor, establishes that when the prosecutor was asked what governmental interest would possibly be served by not providing use immunity or not having this witness testify, he was absolutely unable to explain any state interest that would be served by it. This is a situation in which I think the record screams out with the fact that his interest was ensuring that the witness who arguably knew more about this murder than any other human being because he conceitedly committed it, would not be able to testify to the jury as to what he knew about the charged offense. And at the same time, I mean, theoretically, the considerations which would apply to Sheridan would have applied to Amos. That is to say, why consummate that deal? Why not postpone it until after the trial is over, which is a common practice in federal court. But what was done here was to ensure that Amos would testify, knowing the benefits he would receive, but to ensure that Sheridan would not. And I... Well, the Court of Appeal came up with a rationale, which is really what we're reviewing, right? And it said, when pressed for an explanation, the prosecutor told the court, I can't let Sheridan plead before Mr. Amos testifies. Right. And I find it a little strange because... even after Amos testified... I mean, Amos testified as part of the prosecutor's case in chief, right? That's right, Your Honor. So the defense wanted to put Sheridan on as part of its case, which, of course, by that time, that rationale would have exhausted itself. Exactly, Your Honor. Two things about that, and I'm sure the Court is well aware of it. One, that rationale, of course, was never stated by the prosecutor. But as the Court pointed out, at the point that Amos testified, one of two things would be true, that Amos had testified in some way that was unhelpful to the prosecution, that the prosecution wished to rebut with the testimony of Sheridan. And, of course, it did not at that point call Sheridan to impeach anything. So the notion that they were holding him to impeach Amos when they didn't call him to impeach Amos after Amos testified, frankly, doesn't make sense. And, of course, if that had been the purpose, then the purpose was fulfilled at the point that they didn't need Sheridan as an impeachment witness. And let's think about this. The prosecutor knows that this is a major issue. He knows that the trial judge is deeply troubled by the fact that he's denied access to Sheridan. A good prosecutor would say, if that was his motivation, I'm now about to eliminate this appellate issue. I created a big appellate issue at the beginning of this trial. I can eliminate it by releasing Sheridan at this point, and the defendant will have nothing to complain about if there's a conviction. All of that, I think, speaks to really what was the critical element for the State Court, which is materiality. But I posit to you that let's say you had a situation in which the prosecutor in this case had explicitly stated, and the judge said, well, why don't you consummate the deal and allow the defense to call Sheridan? This is a key witness. This is the man who committed the murder. If the prosecutor said, Your Honor, I have to be candid. If they call Sheridan, it will hurt my case. Then this court, any court, would be perfectly entitled to rely on that statement as evidence that Sheridan was material to the defense. Your Honor, I submit that's the only inference that you can draw from this record. That is to say, the only inference that you can draw why Sheridan was not either called as a prosecution witness or released to the defense, as Amos was by the consummation of the deal, is that the prosecutor who had access to Sheridan and knew exactly, assumedly, how he would testify, concluded that he could not have Sheridan testify without endangering his conviction. And we know this. We know from the record that we have that Sheridan had made the statement. Counsel, here's the one theory that sort of bothers me about this. I'm very bothered by the fact that Sheridan is not on the stand, is not available to you. But maybe from the government's perspective, and so I'd just like to address, if this is the argument from the government's perspective, tell me why this is what's corrupt with this. The government's concern is that Sheridan won't get on the stand until he's sure that he's got a deal. And otherwise, he's going to take the fifth. And the government's not willing to give him the deal. They think they know what he's going to say. They think they've got the case nailed down. But there's the possibility that they will give Sheridan immunity by giving him a deal, and Sheridan will get on the stand and say, I did it, I did it deliberately, I did it for money, and the defendant had nothing to do with it. My wife was complicit. I mean, something goes wildly wrong in that case, and the government has now freed this guy effectively, or at least freed him on a minimal charge, a minimal sentence for his cooperation. Well, two things, Your Honor. A 20-year sentence, they're always capable of prosecuting him for perjury. But, Your Honor, the scenario that you've described is exactly – I embrace that. That was what the prosecution was thinking. The prosecution was thinking that because Sheridan was on the record saying to Amos, they want my – I couldn't get him, you can get him, RT 1266-1269. Their fear was that he would get on, tell the truth, say he was paid for it, that as far as he knew Woods had absolutely no involvement, testify truthfully, and that would damage their case. There certainly is a risk to the government here in not putting Sheridan on. I mean, the government's got something at risk as well here in not putting Sheridan on, because this is the triggerman, and they've got him available as a witness and are not putting him on, even though they think he's going to say, yeah, the defendant did it. And – no, no, no, no. I'm sorry, the defendant was behind all of this. Well, I think that what they were convinced of is that he would not say that. And, Your Honor, under Singh v. Prunty, the prosecution has the best – is relied on to have the best assessment of the strength of their case. At the end of the day, this is clear. The prosecution said new, our case is better off if Sheridan doesn't testify than if he does. The converse of that is the defense case is better off if he testifies as opposed to if he doesn't, even if they get some minor remedial remedies. We have the power to obstruct it by significant coercion. We used it, as the state court found. And as a result of that, the key figure in this whole charge defense never reaches the stand and the jury never hears what he has to say. I see I'm down to a half a minute or so, and with the Court's indulgence, I'll reserve that for rebuttal. Thank you. Thank you. We'll hear from the warden. May it please the Court, Lynn McGinnis, California Attorney General's Office for the Respondent, or appellee, rather. As much as I'd like to jump at the bit and answer some of these questions, and I will, I want to back up a minute because the first question, as the Court knows it has to answer, is whether there's any Supreme Court precedent dealing with the issue that's before the Court today. Now, the closest we get, as Justice pointed out, Justice Nelson is Mitchell, and we also have Webb. Now, Webb deals with a judge coercing a witness off the stand, and then the federal courts have come up with this two-part test for what happens when a prosecutor substantially interferes with the process. That's a two-part test that the federal courts have come up with. Now, we have to ask ourselves, in looking at the Court of Appeal opinion here, the Court of Appeal came up with a three-part test, and we have to ask ourselves, is that three-part test dictated by Supreme Court precedent that that would be an unreasonable way for the Court of Appeal to handle this situation? And the answer is absolutely not. There's nothing in Supreme Court precedent that dictates that the two-part test that the federal courts did seem to accept that defendant, petitioner here, defendant there, had a right not to have the prosecution interfere unreasonably without a rationale, interfere with his ability to put on defense witnesses. The Court of Appeal did say that. And then it gives a rationale here on the decision on whatever happened to reporters. This paragraph is less clear than this paragraph. I have it on something that's called page 4 of the decision. And it gives a rationale here, and it says, well, the reason they did this, this is a legitimate tactical decision that was reasonably related to the prosecutor's interest in ensuring that the key witness, Amos, testified truthfully. So they come up with a sort of factual rationale, but it doesn't really work. I mean, it only works, this rationale only works until Amos testifies. And we know Amos testified during the prosecution's case in chief. So the idea of holding Sheridan back as a hammer against Amos going sideways just doesn't apply at all to what defendants try to do, which is to say, okay, now that Amos has testified, we want to put Sheridan as part of our case. Isn't this like Taylor v. Maddox, where they simply make a factual finding that's unsupported by the record? Well, no, Your Honor, because Amos did testify, but by that time, the trial court had come up with another solution to the problem. And what the court of appeal did is they made that finding, but then they said that even if that's not true, we're going to go to the prejudice analysis, and we're going to find that this solution of putting the hearsay statements on instead of the witness solved the problem. And that's ultimately where the court of appeal came down, is on the materiality requirement. Now, as far as ---- I'm going to ask you, this is just to pursue that just a moment. Could a prosecutor blatantly intimidate any number of witnesses in a case, and the theory that testimony would come in, hearsay or not, as to anything they would have said? I mean, how far can this go? Well, no, Your Honor, I would not sanction a prosecutor blatantly intimidating witnesses. And certainly in that case, if the case were on direct review in the federal courts, the Chapman standard of prejudice would apply, and the government would have an uphill burden of showing that this was harmless beyond a reasonable doubt. But we're not on that procedure here, and what we have is a state court decision which gave a remedy to the supposed prosecutor's interference. And I strongly disagree that the prosecutor was coercive. But beyond that ---- Your Honor, how much more coerced can you be than to refuse to complete the deal for no ---- as far as I can tell, no legitimate reason having to do with Sheridan's case, but all in an effort to keep him from testifying on behalf of defense in this case. The prosecutor stated very clearly what was going on. He was going to keep continuing that case until this case was over, knowing full well that Sheridan couldn't very well testify for the defense, couldn't possibly testify for the defense until his deal was completed. Well, Your Honor, in the ---- What stronger coercion do you have? The fact that Sheridan risks losing a very good deal, and two, that the prosecutor says, I'm doing it in order to affect his behavior in this case. If you put those two things together, what do you have other than coercion? Well, Your Honor, in the real world, if you're going to present a case and look at it and decide what witnesses to put on ---- You mean as opposed to this false world here? No, this is ---- What are we talking about? Why don't you just answer my question? I would never consummate a deal with a witness. It doesn't matter what you would do. Why don't you answer my question? The prosecutor ---- Do you remember the question? You said it's not coercive. It's not coercive because you do not consummate a deal with a witness until after the trial is over and there's been a conviction. There could be a mistrial. But Sheridan's not a witness in this case. If he had been a witness, it's one thing. What you're saying is we're going to hold up his deal. We're going to hold up his deal so he will not testify in this case in a way that might help the defense. How is that not coercive? That's a technical decision on the part of a prosecutor as to what witnesses to call. Let's say there's a mistrial. It may be technical, but we're not discussing whether it's technical or tactical. We're asking you how is it not coercive? You said, I mean, you stood there and said it's not coercive. I just don't understand how you can say that something that's done for the purpose of preventing somebody from testifying in this trial for no other reason. The delay was for no other reason. The prosecutor accused it. And how that can not be coercive? You might say it's perfectly appropriate coercion. It's the kind of coercion that's fine to use. But how can you say it's not coercive? Well, I don't like the word coercion because if there's a mistrial in this case. Well, you may not like the word coercion, but, you know, this is English. How can you say it's not coercive when the clear and explicit threat is we're going to take away your deal and you're going to wind up spending many, many more years in prison if you open your mouth and testify in this case. The prosecutor did not do that. I strongly disagree with that. The prosecutor had no objection to Sheridan testifying for the defense. The prosecutor said, go ahead and testify for the defense if you want. Didn't give him immunity, right? He didn't give him immunity. And didn't complete the deal, which would have allowed him to testify without the fear that something bad would happen to him, right? He didn't give him immunity, but he didn't prevent him from testifying. And, in fact, the Amos deal, that's misrepresented in the record. The Amos deal was not completed until after the trial was over either. There was testimony that there was going to be a deal that if he testified truthfully at trial, then he would get 20 years. Amos testifies for the prosecution, so the part of his deal is that he testifies. So the witness of the prosecutor wants to testify testifies for the prosecution. That's why Amos is testifying. His deal is not completed, and you've got this hammer over him. You have to sort of live with that, and then that comes out in cross-examination. But Sheridan has a Fifth Amendment right not to testify, which he will exercise so long as this other thing is hanging over his head. And the prosecutor says, I'm not going to take the anvil that's hanging over his head. I'm not going to cut it away until this trial is over, just so he will have his Fifth Amendment right. I won't have him interfere with this trial. I mean, this may seem like a tactical decision. It may seem a little bit how you can call it not coercive. Well, you know, I'm never going to convince the court, obviously. So I don't want to spend my time arguing a point that I'm obviously not going to convince the court on. I want to, you know, spend my time on the courts. I've already gone through the AEDPA standards. I want to spend my time on, you know, we still have to look at under Brecht. We're now on federal habeas. We have to look under Brecht whether this was harmless. And what ended up happening is that all of Sheridan's statements were admitted for their truth. Every statement that the defense wanted in. And, in fact, the defense got a benefit from this because if Sheridan had testified for the defense, he would have been subject to cross-examination by the prosecutor with the same statements. Now what ends up happening is all his hearsay statements come in for the truth, yet the statements that the prosecution wants to introduce to counter that, and there are only three or four of those statements, those statements the jury was specifically instructed that they were only to consider them for state of mind or to explain conduct. The defense has yet to point to any statement. But Sheridan could not be cross-examined as to those statements, right? So those statements come in implicating this defendant, and he's not there to be cross-examined by the defense, right? Right, but they don't come in for their truth, and the jury's specifically instructed to that effect. And Sheridan is never able to implicate this defendant, and it's pointed out at the trial that Sheridan has no idea that this defendant was involved in the murder because Sheridan was hired by a middleman. Now I think the important thing to remember here before I close, because the button is on here, is that we do have a reasoned state court decision. I'm not sanctioning, you know, prosecutorial interference. That's why they're reviewing courts. But federal habeas is reserved, and I think the Supreme Court has a series of decisions lately. It's reserved for the most limited of circumstances. The court of appeal made a carefully reasoned decision considering this matter. Ultimately, it ruled based on lack of prejudice to the defendant under these circumstances. That decision is not unreasonable, and it's entitled to deference in this habeas proceeding. And with that, I would submit. Okay, thank you. Mr. Redden, you're almost out of time. We'll give you a total of two minutes for rebuttal. Very briefly, on the point of clear Supreme Court authority, I submit that when the state court found an improper, significant coercion in the state court proceeding, it relied on In re Martin, which was a 1987 state case, which in turn relied on Webb and so forth. The principles that a prosecutor can't deliberately and intentionally and for tactical reasons keep a defense witness off the stand are well established. What do you say about prejudice? Prejudice is the key question, Your Honor. And a quick response. Correct, which is even more differential than ESPA, right? Correct. Yes, yes. And the question there is, was there a substantial impact and a jury's impact on these proceedings? One quick, well, let me respond to that and then make a quick point for Judge Boddy. We have a situation in which the prosecution has the ability. The state just referred to the fact that it had some hearsay statements that it managed to get in which were helpful to it. It had the ability to get Sheridan on the stand, if they thought it would be helpful, to bring out these hearsay statements that they thought would be helpful. It wouldn't come out right in front of the court. So they theoretically would have had this helpful material that the defense didn't get to cross-examine, but then would. It made the decision that at all costs Sheridan must not testify. I submit, Your Honor, that the assessment, which can only be explained by a decision that this defense witness would materially hurt the prosecution, is the only inference that can be drawn from the record. And that in itself establishes prejudice because under Valenzuela-Bernal, we recognize that when the prosecution has the sole access to a witness that you can interview and make a more detailed offer of proof, that their significant role in the offense can establish materiality. And, of course, in this case, this was the most significant witness of all. And I forgot to point out that to judge by these concerns, the prosecution had a way of dealing with this to make sure that Sheridan didn't testify untruthfully. They simply have him enter his plea. This happens in federal court a hundred times a day. You enter the plea. You agree to testify truthfully, but your sentencing is deferred until after the trial is over. Then you don't have a Fifth Amendment privilege. You can be called. And the prosecution has the weapon that if you testify untruthfully, then the deal is off and he would get life without or death. In this situation, murder for hire. So they had all the ammunition they needed to ensure that he testified truthfully. Their fear was that he would testify truthfully, and that would be helpful. Mr. Sheridan, I have one question, and I'm pleased to be able to ask this question to somebody who's very experienced and obviously a very, very good lawyer. The AEDPA standard is so high. Why wasn't the ‑‑ and this question seems to be a very serious question to me. I think it's a very interesting, provocative question, and there's, you know, there's lives at stake here. Why wasn't it taken to the Supreme Court in the first instance rather than brought to us on habeas? Well, Your Honor ‑‑ Why wasn't an appeal taken from the California Supreme Court? Okay. It will be speculation since I did not handle the direct appeal. I only handled the federal habeas. But the fact of the matter is that the cost of a cert petition by someone represented by counsel is actually very high. I mean, printing and so forth. The statistical odds, as we know, are of any ‑‑ But you have a far more favorable standard on direct review from the California Supreme Court than you do by coming to us. Well, that's true. That's true. But you have to demonstrate, you know, a clear conflict in the circuit and so forth, and this was not a decision ‑‑ Or a substantial federal question. Or a substantial federal question. And this appears to me to be the kind of thing that might have been a substantial federal question, much easier to answer than telling us that it violates clearly established Supreme Court process. As I say, you could say, other than an enormous amount of money, what do you have to lose because it was denied, then you could take the case into federal court. I will say this. I mean, AEDPA is a high standard. Absolutely. And we have a decision like pinholster recently, you know, which makes it clear that it's a highly deferential standard. But if you look at the legislative history of AEDPA, the argument was essentially made that there should not be federal habeas corpus, and it was passed with a clear understanding that there remain cases of egregious procedural and constitutional violations in state court that have to be reviewed in federal court. And we have a situation here, and the court had one earlier this week, in another case I'm familiar with, where the state court establishes essentially the constitutional wrong. I think they established it when they said there was significant coercion exercised by the prosecutor. I think that they clearly did not follow the Valenzuela-Bernal rule that when the prosecution keeps someone off the stand that they have complete access to, and you can't get to an interview, as they said, we're not going to allow any depositions, and that person is key to the case, and they had every opportunity to use him themselves. It would be helpful. Then you're in a situation where prejudice has been demonstrated, even under the AEDPA standard, the Brex standard. Thank you. Thank you. The case is argued. We'll stand to move. We'll hear argument in the last case.
judges: Kozinski, Nelson D. W., Bybee